UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC

2022 JAN 18 P 12: 05

JAN 18 2022
RECEIVED

SCREENED BY
U.S. MARSHALS

| | |
|---|---|
| DENNIS M. McGUNAGLE, <br> 425 L Street, NW, Apt. 106 <br> Washington, DC 20001-2522 | ) <br> ) <br> ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALEJANDRO MAYORKAS, <br> Secretary of Homeland Security <br> 2707 Martin Luther King Jr. Ave, SE <br> Washington, DC 20528-0485 | ) <br> ) <br> ) <br> ) |
| | ) |
| Defendant. | ) |

Case: 1:22-cv-00126 JURY DEMAND
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 1/18/2022
Description: Employ. Discrim. (H-DECK)

**JURY TRIAL DEMANDED**

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1.      Plaintiff Dennis M. McGunagle ("Plaintiff") brings this action pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"). As set forth below, Plaintiff alleges that Defendant, Department of Homeland Security ("Defendant"), discriminated against him on the basis of sex (male). In addition, Defendant adversely altered the terms and conditions of Plaintiff's employment when it subjected him to a hostile work environment that culminated in Plaintiff's involuntary and permanent reassignment to a marginal position.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action under 28 U.S.C. § 1331; 42 U.S.C. § 2000e-16; and 42 U.S.C. § 2000e-5.

3.      The unlawful employment practices were committed within the jurisdiction of the United States District Court for the District of Columbia where Plaintiff resided and was employed at all times relevant to this action; therefore, venue is proper in this judicial district under 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-16; and 42 U.S.C. § 2000e-5.

## PARTIES

4.      Plaintiff is a person within the meaning of 42 U.S.C. § 2000e(a).  Plaintiff remains employed by the Department of Homeland Security, Office of Inspector General ("DHS OIG") as a GS-1811-15 Special Agent in Washington, D.C.  Prior to the events giving rise to this complaint, Plaintiff was the Deputy Assistant Inspector General for Investigations ("DAIGI"), Senior Executive Service (SES) member, ES-1811-00, for the DHS OIG.

5.      Defendant is Alejandro Mayorkas, Secretary of the Department of Homeland Security, a federal executive agency.  Defendant Mayorkas is sued in his official capacity only.

## EEOC COMPLAINT

6.      On June 8, 2020, Plaintiff timely initiated the informal administrative complaint process with the DHS Office for Civil Rights and Civil Liberties ("DHS CRCL").

7.      On June 29, 2020, Plaintiff timely filed a formal administrative complaint with DHS CRCL (EEOC No. 570-2021-00877X) alleging sex discrimination and a hostile work environment based on sex (male).  Plaintiff alleged an uninterrupted series of highly related events

2

subjected him to a hostile work environment, culminating in his permanent reassignment to a marginal position with limited duties.

8.      On March 23, 2021, DHS CRCL issued a Report of Investigation to Plaintiff.

9.      DHS CRCL issued a Right to Sue letter to Plaintiff on March 25, 2020, which is attached to this Complaint.

10.     On April 19, 2021, Plaintiff requested a hearing before an administrative judge at the Equal Employment Opportunity Commission ("EEOC").

11.     On July 29, 2021, Administrative Judge Justin T. Evans issued an Acknowledgement Order, directing the parties to submit Preliminary Case Information, which Plaintiff timely submitted through counsel.

12.     On October 25, 2021, the EEOC transferred the matter to Administrative Judge Kevin Rung in the New Orleans, Louisiana, Field Office.

13.     On December 3, 2021, Plaintiff filed a motion to reinstate dismissed claims, contending that DHS CRCL misconstrued both the facts and well-established legal precedent permitting the inclusion of events outside of the EEOC's 45-day statute when they are a part of one integrated hostile work environment. The closely related actions taken against Plaintiff were initiated by the same core group of responsible management officials over an extended period, with the overall intent of driving Plaintiff out of the DHS OIG and law enforcement. After a status conference on December 7, 2021, the administrative judge permitted the parties to submit additional argument pertaining to the partial dismissal of Plaintiff's hostile work environment claims, which the parties submitted on December 16, 2021, and December 27, 2021, respectively. To date, the AJ has not ruled on the parties' motions.

14.     More than 180 days have elapsed since Plaintiff filed his formal administrative complaint without the issuance of a Final Agency Decision.

15.     Pursuant to 42 U.S.C. §§ 2000e-5, 2000e-16(c), and 29 C.F.R. § 1614.407, Plaintiff now withdraws his hearing request from the EEOC and files this civil action.

## FACTUAL ALLEGATIONS

16.     In early 2018, Plaintiff was the target of whistleblower retaliation after he made multiple protected disclosures, including a disclosure that the OIG was diverting more than $10 million in supplemental funds appropriated in FY 2019 for the investigation of disaster relief fraud to finance the DHS OIG's relocation of its headquarters office in Washington, D.C.  That case is the subject of an Individual Right of Action appeal to the Merit Systems Protection Board ("MSPB") pursuant to 5 U.S.C. § 1221.  McGunagle v. Dept. of Homeland Security, DC-1221-21-0461-W-1 and -W-2 (currently stalled as Defendant challenges the authority of the MSPB's administrative judges to hear any cases).

17.     This Complaint concerns the sex discrimination and hostile work environment visited upon Plaintiff by four top female executives of DHS OIG whose campaign included placing Plaintiff under a pretextual investigation that stereotyped him based on gender; barring him from the workplace; issuing four false, defamatory, and failing performance appraisals for the same fiscal year (which stand in stark contrast to the exemplary appraisals Plaintiff received as a senior executive and for the 30 prior years); removing him from the SES and stripping him of his position as DAIGI; depriving him of any work assignments for 14 months; requiring him to conduct firearms qualifications separately from the workforce; requiring degrading one-on-one EEO training; physically isolating him from the rest of the workforce; threatening him with violence by

referencing a concealed weapon during an office meeting; reassigning him to a position as a GS-15 "program manager;" and permanently depriving him of any substantive law enforcement duties.

18.      These four female executives were Jennifer Costello, the former Chief Operating Officer of DHS OIG; Karen Ouzts, the former Acting OIG Counsel; Diana Shaw, the former Assistant Inspector General for Special Reviews; and Michele Kennedy, the former Assistant Inspector General for Investigations ("AIGI").

19.      In 2019, after the newly appointed Inspector General ("IG") Joseph Cuffari was himself targeted by three of these female executives, he commissioned the law firm WilmerHale to conduct a $1.3 million investigation into their misconduct, resulting in the removal of Costello and Ouzts and the departure of Shaw to another federal agency.  Collectively referring to Costello, Ouzts, and Shaw by the *nom de guerre* given to them within OIG, the "Mean Girls," an allusion to the movie about vicious infighting in a high school clique, the eight-month (publicly available) investigation documented their efforts to assume control of the DHS OIG.  *Report of Independent Investigation:  Allegations of Misconduct by Jennifer Costello, Karen Ouzts, and Diana Shaw* ("the WilmerHale Report").  Among other matters, the WilmerHale Report confirmed that Ms. Costello masqueraded as the Acting Inspector General and that the women together conspired to force former Acting IG/Deputy IG John Kelly into retiring prematurely, while also actively attempting to derail the Senate confirmation of Mr. Cuffari as the permanent IG.

20.      Although the WilmerHale Report's primary focus was the women's attacks on Mr. Cuffari and Mr. Kelly, it also confirmed that the three women treated Plaintiff disparately in comparison to one specifically identified, similarly situated female executive (Louise McGlathery, Assistant IG for Management) who engaged in far worse misconduct than Plaintiff was

pretextually accused of committing.  The WilmerHale Report recounted the words of former Deputy IG Kelly that the women "persecuted" Plaintiff, but the investigators gave short shrift to the extensive damage the women inflicted on Plaintiff's character and livelihood.  The WilmerHale Report also glossed over the three women's particularly vicious and disparate treatment of Plaintiff in comparison to other similarly situated female executives.

21.     Beginning in 2018, as Costello and her acolytes began their efforts to consolidate their power in the DHS OIG, Plaintiff initially was unaware of the gender animus motivating their actions towards Mr. Kelly, Plaintiff, and other non-executive male staff members.  The WilmerHale Report laid bare the full extent of this gender animus directed at certain male staff members while largely ignoring Costello's targeting of others, including Plaintiff.  The report exposed certain written communications between Ms. Costello, Ms. Ouzts, and others, demonstrating a clear camaraderie built on shared gender; for example, when Ms. Costello likened Mr. Kelly to the "Night King" in the television series *Game of Thrones* because he "just won't die."  While the WilmerHale Report served Mr. Cuffari's intended goal of ridding himself of female executives who targeted him, in part because of his gender, Defendant has gone to great lengths to bar Plaintiff's access to evidence of Ms. Costello's similar targeting of Plaintiff.  By failing to fully and transparently investigate Ms. Costello's misconduct pertaining to Plaintiff, Defendant accedes to and propagates the gender discrimination and hostile work environment that Plaintiff continues to endure.

**Plaintiff's Career Prior to Ms. Costello's Misconduct**

22.     Prior to being subjected to an unlawful hostile work environment and gender discrimination, Plaintiff served as the Deputy Assistant Inspector General (SES) for the DHS OIG,

and in that role, he built and led the OIG Headquarters Operations Division, where he oversaw a $54 million budget for Headquarters and approximately 32 field locations nationwide. At Headquarters, he provided executive leadership for highly specialized investigative units including OIG's Major Frauds and Corruption Unit, Special Investigations Division, and Digital Forensics and Analysis Unit.

23.     Prior to his selection as DAIGI in November 2015, Plaintiff had over 30 years of experience as a federal Special Agent in increasingly important and complex positions across the Caribbean and continental United States. Plaintiff's accomplishments drew upon his experience in the U.S. Army Military Police Corps and U.S. Army Criminal Investigations Division. For the five years before his selection as DAIGI, Plaintiff served as the Special Agent-in-Charge ("SAC") of the DHS OIG Field Office in San Diego, California, where he led dozens of agents investigating public corruption, bribery, excessive force, civil rights violations, narcotics smuggling, and financial crimes unique to the two largest ports of entry in the world. While serving as an Assistant Special Agent-in-Charge ("ASAC") for the Federal Emergency Management Agency's OIG, Plaintiff supervised that agency's response to the terrorist attacks on the World Trade Centers in New York City.

24.     Throughout his tenure in these positions, Plaintiff's service and performance were consistently recognized as exemplary, and the record of his conduct was unblemished.

25.     The operational complement to Plaintiff's career was the expanding role he played in leadership positions. Prior to Defendant's unlawful acts, Plaintiff had every intention of heading an office of investigations as an AIGI, particularly at DHS OIG where his former immediate

supervisor, AIGI Drew Oosterbaan, assured Plaintiff on numerous occasions that he was the best qualified candidate to succeed Mr. Oosterbaan when he retired in late 2017 or early 2018.

26.     As DAIGI, Plaintiff developed stronger relationships with DHS OIG oversight committees in the U.S. Congress, relationships that took years to cultivate and called upon Plaintiff to provide his investigative findings and unique expertise to these committees.  Plaintiff was a well-known, highly regarded figure throughout the closely-knit Inspector General community. That included being a respected representative on the Council of the Inspectors General on Integrity and Efficiency ("CIGIE"), an independent entity within the Executive Branch created by Section 11 of the Inspector General Act of 1978, 5 U.S.C. App., Pub. L. 95–452, §1, 92 Stat. 1101 that has as its mission addressing integrity, economy, and effectiveness issues in the throughout IG's offices.  Advancing through its ranks requires years of experience in increasingly demanding positions in an IG's office or a similar office in the federal government's senior ranks.  Plaintiff's accomplishments as DAIGI positioned him for advancement to the AIGI level, Deputy IG, or IG.

27.     But for Defendant's unlawful actions, there is no reason to doubt that Plaintiff's exceptional career in federal law enforcement would have taken him to top career positions either in DHS OIG or another IG's office.  Exacerbating Defendant's unlawful actions is the requirement that all federal law enforcement agents in the 1811 series, absent a discretionary waiver, retire by age 57.  Defendant was well-aware that once Ms. Costello and her acolytes took the unlawful actions that are the subject of this suit, Plaintiff would no longer have the time to right his career and resume his advancement as a career federal law enforcement officer, absent his reclassification to a non-law enforcement position.

## Plaintiff's Performance as DAIGI and Commitment to Diversity

28.     Plaintiff's SES performance appraisal for FY 2017 was his final appraisal as DAIGI before the actions that gave rise to this Complaint.  His rating official was AIGI Oosterbaan, who would become Counsel to the IG for a brief time before he retired.

29.     For FY 2017, Mr. Oosterbaan awarded Plaintiff a perfect score of 500 in individual critical elements and an overall rating of Outstanding.  That rating recognized Plaintiff's supervision of "highly sensitive" investigations, and oversight of DHS OIG's Major Frauds and Corruption Unit, Digital Forensics and Analysis Unit, and Special Investigations Division, among others.  It lauded the Plaintiff for being a "strong change-leader" in engineering "critically important advances" in OIG, his "innovative and dynamic" thinking, and his "energetic engagement" with "subordinates."

30.     Plaintiff's perfect rating in the Critical Element of "Leading People" in this appraisal also recognized his promotion of "professional development, teamwork, collaboration and objectivity."  That same Critical Element also recognized Plaintiff for "ensuring inclusiveness" and inspiring a "productive, innovative and dedicated workforce."

31.     Plaintiff could only achieve this rating by also receiving a perfect score for the manner in which he:

> Recruits, retains, and develops the talent needed to achieve a high quality, diverse workforce that reflects the nation, with the skills needed to accomplish organizational performance objectives while supporting ***workforce diversity, workplace inclusion, and equal employment policies and programs***.
>
> (emphasis supplied).

9

32.     Mr. Oosterbaan's FY 2017 rating of the Plaintiff was reviewed and approved by former Deputy IG Kelly and an agency-wide DHS body, the Performance Review Board.

33.     For the previous year, FY 2016, Mr. Oosterbaan had also given the Plaintiff an overall Outstanding rating and a perfect score on this same Critical Element and for his promotion of EEO policies and programs.

34.     Mr. Oosterbaan also recognized Plaintiff's value to the DHS OIG even before he became DAIGI as "nothing short of transformative" and that his "subordinates at all levels are inspired, motivated and professionally satisfied for the first time in a long time."

35.     Mr. Oosterbaan's FY 2016 rating of Plaintiff was reviewed and approved by former IG John Roth (male).  Like the previous year's appraisal, it was also reviewed and approved by the DHS Performance Review Board.

### Preferential Treatment of Women During Ms. Costello's Tenure

36.     Mr. Oosterbaan always spoke glowingly about Plaintiff.  Privately, he assured him that everyone, including Acting IG/Deputy IG Kelly, knew that Plaintiff was the best qualified individual to succeed him as AIGI.  Ms. Costello, whom the WilmerHale Report confirmed exercised considerable influence over Acting IG Kelly, had other plans.

37.     On December 21, 2017, several months before he retired, Mr. Oosterbaan stepped aside as AIGI for two months to become Counsel to the DHS IG.

38.     Up to that point, although Ms. Kennedy (female) had been a DAIGI like Plaintiff; her experience in operational law enforcement and intelligence collection was dwarfed by his. Unlike Plaintiff, who had extensive experience as a SAC in OIG's regional offices, including the largest in the country, Ms. Kennedy had no comparable experience.

39.     Nonetheless, in late December 2017, Ms. Costello succeeded in persuading Acting IG Kelly to appoint Ms. Kennedy as AIGI without competition.  Mr. Oosterbaan told Plaintiff that Mr. Kelly appointed Ms. Kennedy because she "was a woman and needed to be given a chance" prior to her retirement.  Ms. Kennedy formally assumed the AIGI position in early 2018 and retired in July 2019.

40.     On March 9, 2018, Mr. Oosterbaan retired as Counsel to the IG.

41.     The following day, March 10, 2018, Ms. Costello announced that Diana Shaw (female) would serve as Acting Counsel (SES) position as a GS-15.

42.     On June 22, 2018, Ms. Costello announced that she had created a new position as AIG for Legal Affairs and promoted Diana Shaw (female) into that position non-competitively with a three-year appointment to the SES.  That promotion made Ms. Shaw the most senior legal counsel in DHS OIG.

43.     The following year, on March 27, 2019, Ms. Costello again non-competitively promoted Ms. Shaw to the permanent SES position of AIG for Special Reviews.

44.     Effective October 1, 2018, Ms. Costello announced that she was placing Sondra McCauley (female) into the position of Acting AIG for Audits without competition upon the departure of the permanent AIG for Audits John McCoy (male).

45.     In February 2019, Ms. Costello installed Ms. Ouzts (female) as Deputy Counsel to the IG by hiring her noncompetitively from the U.S. Department of State, where Ms. Ouzts had not been serving in an attorney position.  That appointment had the effect of making Ms. Ouzts the most senior legal counsel in DHS OIG.

11

**Ms. Costello's Hostility Toward Male Executives**

46.     Beyond documenting how Ms. Costello's sponsorship benefited Ms. Ouzts, Ms. Kennedy, and Ms. Shaw, the WilmerHale Report also documented that she recruited Ms. Ouzts and Ms. Shaw as lieutenants in her attempt to overthrow the Deputy IG and IG.

47.     The WilmerHale Report documented that Ms. Costello, Ms. Ouzts, and Ms. Shaw manipulated the SES selection process despite lacking the legal authority to make senior executive appointments.  Beyond installing only women in her inner circle without competition, Ms. Costello was also motivated to take these actions to starve former Deputy IG Kelly and incoming IG Cuffari of senior staff, to force Kelly to retire prematurely, and to arrogate power rightfully belonging to Mr. Cuffari.

48.     The WilmerHale Report also documented that Ms. Costello orchestrated this plot to benefit her accession to the position of IG to the detriment of Mr. Kelly and Mr. Cuffari, both males.

49.     The WilmerHale Report laid out in laborious detail how Ms. Costello usurped power in DHS OIG and masqueraded as Acting IG, a role belonging to Kelly, by enlisting Ms. Ouzts and others to create  a new position for herself as a second  Deputy IG; reporting Mr. Kelly for investigation to the Council of Inspectors General on Integrity and Efficiency ("CIGIE") to destroy his reputation in the IG community and through the media; sending a confidential report to the DHS OIG Senate oversight committee falsely implicating Mr. Kelly in directing his staff to sanitize its initial disaster audit reports to put FEMA in a positive light; circulating a draft of that pretextual report within senior ranks of DHS OIG to make it impossible for Mr. Kelly to lead the organization; turning her back on Mr. Kelly and addressing him unprofessionally when he was

speaking in OIG staff meetings; conducting secret meetings with AIGIs and DAIGIs without Mr. Kelly; sending memoranda and other correspondence behind the scenes generating support for her plan to force Mr. Kelly to retire prematurely, citing his inability to conduct OIG business; badgering Mr. Kelly into retiring on the ground that doing so would promote transition planning; and sending emails to other female staff degrading Mr. Kelly.

50.     Ms. Costello's attempted takeover of DHS OIG also targeted Mr. Cuffari.  The WilmerHale Report documented that Ms. Costello attempted to derail Mr. Cuffari's Senate confirmation as permanent IG; interfered with Mr. Cuffari's ability to create a senior staff by improperly filling vacant SES positions in anticipation of his Senate confirmation; lodged a complaint with CIGIE after Mr. Cuffari was confirmed baselessly charging him with abusing his authority as DHS IG and compromising the independence of DHS OIG; sent a report leveling these same charges against Mr. Cuffari to DHS Senate and Congressional oversight committees; openly ridiculed and was insubordinate to Mr. Cuffari once he was in office; circulated memoranda and other correspondence  in OIG describing the office as belonging to her; and took control of internal investigations and directed allies to withhold information about investigations from Mr. Cuffari.

**Costello Directs Plaintiff's Placement on Administrative Leave and Under Investigation**

51.     Before Ms. Costello targeted Mr. Kelly and Mr. Cuffari, she set her sights on eliminating Plaintiff from DHS OIG's senior ranks.  She was successful, expertly recruiting the very female executives who had benefited most from her largesse:  Kennedy and Shaw, and later, Ouzts.  At Ms. Costello's direction, on June 19, 2018, Ms. Kennedy, whom Costello had championed for the AIGI position, placed Plaintiff on administrative leave for five days beginning

on June 19, 2018. No reason for this action was given, and Ms. Kennedy arranged to have Plaintiff escorted from the building by one of his subordinates, SAC Gary Thorne.

52.     On June 26, 2018, at Ms. Costello's direction, Louise McGlathery (female), the Assistant Inspector General for Management, herself under administrative investigation and eager to comply with Ms. Costello's demands, extended Plaintiff's administrative leave for five additional days. That same day, Ms. McGlathery observed Ms. Kennedy and Ms. Costello laughing about Plaintiff's apparent demise in Ms. McGlathery's office.

53.     Plaintiff's extended leave was based on a pretextual and secret inquiry that Ms. Costello and Ms. Shaw opened in the Office of Counsel, without adherence to any investigative standards or independent review. Ms. Shaw, and later Ms. Ouzts, weaponized such administrative inquiries in the OIG's Office of Counsel, conducting them under the watchful eye of Ms. Costello outside of the OIG's investigative components. Costello, Shaw, and Ouzts also transferred a wide swath of the OIG's personnel management functions away from Ms. McGlathery's component and into the Office of Counsel during this same time period. This was designed to systematically eliminate certain employees, including Plaintiff, without any regard for due process or the collection and consideration of exculpatory evidence.

54.     Other than notice that he was under investigation for unspecified allegations of misconduct, this second administrative leave notice imparted no information to Plaintiff about the investigation or the allegations against him. As of the date of this Complaint, Defendant continues to closely guard the two administrative inquiries against Plaintiff that Ms. Costello and her acolytes directed and manipulated.

55.     Contemporaneously with these events, Ms. McGlathery was herself under investigation for allegations of racial discrimination, although unlike Plaintiff, she continued to occupy her senior executive position.  Ms. McGlathery, a female, was able to keep herself in Ms. Costello's good graces by corresponding with her and the OIG's "Mean Girls" about topics such as television shows, shoes, and other non-work-related matters.  Ms. McGlathery's access stands in stark contrast to Ms. Costello's demeanor towards Plaintiff, which was hostile and non-communicative from the first time Plaintiff attempted to introduce himself at the beginning of Ms. Costello's tenure at DHS OIG.

56.     Over the course of the next nine months, Ms. Costello would extend Plaintiff's placement on administrative leave four times, Ms. McGlathery would extend it three times, and Ms. Kennedy would extend it twice.

57.     At no time while he was under investigation was Plaintiff provided with notice of the investigation or the charges leveled against him, nor was his extended placement on investigative leave ever reported to the DHS oversight committees as required by 5 U.S.C. § 6329b(d)(1).

58.     The only time that Plaintiff was asked or directed to provide information in connection with this pretextual investigation was August 21, 2018, when he was interviewed by female members of the OIG Office of Counsel and the Human Resources Management Division. The interviewer posed a series of degrading questions to Plaintiff, asking about fictional illicit sexual relations with multiple female subordinates and stereotyping Plaintiff as an aggressive, foul-mouthed male who lacked any personal decorum.  DHS OIG was well aware that none of these alleged incidents ever occurred.  They were merely long-discredited, recycled allegations

originally made by a former subordinate of Plaintiff's in response to that employee being disciplined on multiple occasions.

59.     Both before and after interviewing Plaintiff, female attorneys in the Office of Counsel were tasked with contacting former female subordinates of Plaintiff in an unsuccessful attempt to solicit negative information about him.  When the female employees failed to provide negative information, and in fact provided exculpatory information, the female attorneys told them that their statements were no longer needed.  This was part of a concerted effort by the Office of Counsel and others to stereotype Plaintiff on the basis of gender, implying that he could not supervise female employees without acting inappropriately, making sexually charged statements, or soliciting them for sexual relationships.

### Pretextual Appraisals and Removal from the SES by Ms. Costello and Mr. Cuffari

60.     Early in each performance cycle, members of the SES are given Executive Performance Plans that specifically set forth the critical elements of their performance for the coming year and specific accomplishments they must meet to be rated at particular levels.  These plans are broken down into five critical elements of performance that are constant throughout the entire federal Senior Executive Service.

61.     At the end of performance cycle, SES employees are rated against each of these critical elements and given an overall numerical rating.  At DHS OIG, the overall ratings range from Unsatisfactory or level 1, to Outstanding or level 5.  Members of the SES are also eligible for performance bonuses that are determined by overall rating level.

62.     Plaintiff was rated Outstanding in the three annual appraisals he received while under Mr. Oosterbaan's supervision as DAIGI and received annual pay raises and bonuses commensurate with that performance level.

63.     For the first time, in FY 2018, Plaintiff was not given an Executive Performance Plan for that performance cycle.  That responsibility fell to Ms. Kennedy.

64.     Mr. Oosterbaan stepped aside as AIGI on December 21, 2017, three months into FY 2018, and left behind no record that Plaintiff's performance had fallen off since his rating for FY 2017.

65.     The FY 2018 performance cycle ended on September 30, 2018, nine months after Ms. Kennedy became AIGI.  Ms. Kennedy never issued Plaintiff a performance plan for FY 2018.

66.     On February 21, 2019, Ms. Kennedy issued Plaintiff the first of four pretextual and procedurally defective performance appraisals for FY 2018.  It was at the Unsatisfactory level.

67.     That appraisal contained a fabricated account of what Plaintiff supposedly did and did not do as DAIGI from October 1, 2017, through June 19, 2018, when Ms. Kennedy placed Plaintiff on administrative leave for undisclosed reasons.

68.     The appraisal also contained a summary of the false and pretextual misconduct allegations that Ms. Costello, Ms. Kennedy, Ms. Shaw, and the newly appointed Acting Counsel Ms. Ouzts concocted to remove Plaintiff from his position.

69.     According to the appraisal, two internal "inquiries" performed at Ms. Costello's direction allegedly found that Plaintiff compromised the objectivity of two unspecified OIG investigations; used profanity in the workplace; spoke to and about women in misogynistic terms; and made derogatory comments about one employee's disability and another's national origin and

17

religion. In sum, the Plaintiff was alleged to have offended members of virtually every protected class under Title VII, all in one abbreviated performance cycle, a stark departure from his three decades of public service in which he had successfully hired and supervised multiple diverse and close-knit office staffs.

70.     On March 22, 2019, Ms. Kennedy issued a memorandum to Plaintiff titled "Return to Duty," a misnomer. It directed Plaintiff to return to the office on March 25, 2019, to pick up his entry card and laptop and "placed [him] in telework status until further notice." In fact, he remained barred from the office until September 3, 2019.

71.     The only assignments Ms. Kennedy gave to Plaintiff while he was on fulltime telework were marginal. She directed Plaintiff to update his qualifications in firearms, defensive tactics, and flying while armed, and his periodic required training in ethics, the NO FEAR Act, travel card and information security training, Privacy Act training, and other Special Agent training. Ms. Kennedy also directed Plaintiff to take refresher EEO training and to participate in one day of EEO training with a private attorney selected by DHS OIG, who ended the session early after informing Plaintiff that she saw no need for him to be there.

72.     Ms. Kennedy understood that Plaintiff, who was accustomed to running a large investigative division with six sub-units, would suffer serious psychological harm and embarrassment while barred from performing his duties, and she assured Ms. Costello that Plaintiff would retire under the strain.

73.     When Costello's efforts to force Plaintiff to retire failed, she directed Ms. Kennedy to return Plaintiff to duty status, as she was starting to feel pressure from Congressional oversight staff for Plaintiff's extended administrative leave, as Plaintiff contacted and corresponded with

that staff during his administrative leave.  On the day that he was directed by Ms. Kennedy to report to the OIG office, March 25, 2019, Mr. Kelly notified Plaintiff that he was proposing to remove Plaintiff from the SES and to reduce his pay.  His decision was based entirely on the first of Plaintiff's four FY2018 fabricated performance appraisals and other false information fed to him by Ms. Costello, Ms. Ouzts, and Ms. Kennedy as signatory.

74.     After he retired on June 10, 2019, Mr. Kelly confessed to Plaintiff that he had been misled by Ms. Costello into proposing Plaintiff's removal from the SES, but the matter was "out of [Mr. Kelly's] hands," and he considered himself powerless to intercede.  Mr. Kelly advised Plaintiff to retire as he had.

75.     Several weeks after Ms. Kennedy issued Plaintiff's first of four FY 2018 appraisals dated February 21, 2019, the Office of Special Counsel ("OSC") notified DHS OIG that the appraisal was improper and constituted a prohibited personnel practice.  OSC twice requested an informal stay of any adverse action against Plaintiff, and twice Ms. Costello refused, never informing Mr. Kelly of OSC's requests.

76.     Despite that finding, three other pretextual appraisals bearing the signature of Ms. Kennedy were issued to Plaintiff for FY 2018, also rating him Unsatisfactory.  At no time did DHS OIG rescind its proposal to remove him from the SES.

77.     On June 4, 2019, Ms. Kennedy issued the second of these appraisals to Plaintiff, manufacturing new allegations of misconduct, despite continued criticism by OSC.  Ms. Kennedy again rated Plaintiff Unsatisfactory, apparently at Ms. Costello's and Ms. Ouzts' direction.

78.     The next two versions of these appraisals, also both at the Unsatisfactory level, were issued on July 16 and July 23, 2019, both bearing Ms. Kennedy's electronic signature.

19

79.     Ms. Costello, masquerading as the "Acting Inspector General," issued Plaintiff a notice on July 23, 2019, stating that she would remove him from the SES effective August 22, 2019.  The WilmerHale Report confirmed that Ms. Costello unlawfully assumed the position of Acting Inspector General; therefore, by the DHS OIG's order of succession, the only person with authority to remove Plaintiff from the senior executive service was Assistant Inspector General Sondra McCauley, who apparently had no knowledge of Ms. Costello's actions against Plaintiff.

80.     Mr. Cuffari was confirmed as IG and reported for work just two days later on July 25, 2019.  Plaintiff met with Mr. Cuffari on August 26, 2019, and he appealed to him to stay Ms. Costello's unlawful actions, citing whistleblower reprisal and gender discrimination.  Plaintiff requested a full and independent investigation.  Ms. McGlathery attended that meeting with Mr. Cuffari.  Mr. Cuffari refused, stating that because Plaintiff was "suing the agency" and "making accusations against my senior staff," he would direct the demotion to proceed, backdated to August 22, 2019.  Ms. McGlathery called Plaintiff after that meeting and assured him that she would make further attempts to appeal to Mr. Cuffari because she had grave concerns with both the procedural and substantive aspects of Plaintiff's removal.

81.     On July 24, 2019, an informal hearing was convened at the MSPB, which, by statute, only permitted Plaintiff to create a record of his Unsatisfactory rating (for transmission to OSC and the Office of Personnel Management) but did not confer any appeal rights.  See 5 U.S.C. § 3592 (Removal from the Senior Executive Service).

82.     Ms. Kennedy testified at the MSPB's informal hearing that although her signature was affixed to both of these appraisals, she was unaware of either one, thus confirming that Ms. Costello and Ms. Ouzts fabricated the appraisals.

### Return to the Office and the Continued Hostile Work Environment Under Mr. Cuffari

83.     On August 30, 2019, Plaintiff was notified by one of his former subordinates, who was now slated to become Plaintiff's supervisor, that he was being returned to the workplace on September 3, 2019, and immediately detailed to non-investigative component of OIG, the Office of Integrity and Quality Oversight ("IQO").   At that time, there were vacant, classified, and full-performance level positions to which Plaintiff could have been assigned in the Office of Investigations.

84.     Plaintiff returned to the office, only to have his duties in his non-investigative detail further circumscribed by Ms. Costello and Ms. Ouzts, who directed Plaintiff's supervisor in IQO to bar Plaintiff from internal inspections of OIG components.   Plaintiff undertook an inspection of an external DHS component, where he encountered senior executives with whom he had worked in his former executive role.   Plaintiff quickly realized that Ms. Costello and Ms. Ouzts placed him in this position solely to embarrass and harass him.

85.     Ms. Costello and Ms. Ouzts also directed that Plaintiff be geographically separated from the rest of the workforce, mandating that Plaintiff and his temporary supervisor move to a remote location in the building, away from the IQO's other staff.

86.     On September 24, 2019, at a widely attended IQO meeting, Ms. Ouzts, who was speaking to the group, looked directly at Plaintiff, and stated that she "liked purses" because they allowed her to carry a concealed firearm, adding that her husband was the "ultimate doomsday survivor" and taught her to always be prepared.   Plaintiff reported this threat to Mr. Cuffari on September 26, 2019, who took no action.

87.     From September 3, 2019, through June 5, 2020, Plaintiff participated in one external inspection with IQO and was assigned no other duties.

88.     On January 24, 2020, Mr. Cuffari's Chief Counsel, James Read, contacted Plaintiff, and expressed a willingness to undertake a full investigation of Plaintiff's claims, asking Plaintiff to document all of his claims in writing.  Plaintiff did so on February 2, 2020, relying on Mr. Read's promise of a thorough review of Plaintiff's claims as they related to the reprisal, discrimination, and harassment that Plaintiff suffered at Ms. Costello's, and now Mr. Cuffari's, direction.

89.     On June 5, 2020, AIGI Gary Thorne, at Mr. Cuffari's direction and in furtherance of the hostile work environment, permanently reassigned Plaintiff back to the Office of Investigations.  Plaintiff's involuntary reassignment left him with no assignments commensurate with a position as a full performance GS-15 Special Agent.  Plaintiff reports to the DAIGI position that he previously held.

90.     Based upon his experience in DHS OIG and in particular his experience as DAIGI, Plaintiff was aware that even if these assignments were more specific, they are far below the level of GS-15 law enforcement agents in the Office of Investigations, much less his duties and responsibilities as the supervisory, SES DAIGI.  Neither individually nor collectively do these projects amount to a fulltime position for a GS-15 Special Agent in the Office of Investigations, nor are they at a level that Plaintiff would have performed or supervised as DAIGI.

91.     Since returning to the workplace through the filing of this Complaint, the only specific project assigned to Plaintiff has been updating the OIG Special Agent Handbook.  The Handbook itself is a thorough manual guiding special agents on many facets of their duties and

responsibilities.  However, by the time that Plaintiff was assigned to update it, the Special Agent Handbook had been in place since DHS' inception in 2003 and was only in need of occasional updating.  Those ad hoc revisions were routinely performed as a small collateral duty and certainly did not comprise fulltime, substantive duties for a GS-15 Special Agent, least of all one as accomplished as Plaintiff.

92.   In June 2020, having heard nothing from Mr. Read regarding his promise of a thorough investigation, Plaintiff initiated the administrative complaint process, recognizing that his permanent reassignment signaled the most recent incident in a hostile work environment that began with Ms. Costello in early 2018 and had continued under Mr. Cuffari.

93.   Plaintiff was contacted by WilmerHale investigators nearly two months later for interviews in July and September 2020.  While he participated in approximately five hours of interviews and submitted voluminous documentation to support his claims, Plaintiff recognized that the investigation was focused elsewhere.

### Female Executives Were Treated More Favorably Than Plaintiff

94.   When she originally extended Plaintiff's administrative investigative leave, on June 26, 2018, Louise McGlathery (female), the Assistant Inspector General for Management, was under investigation for multiple discriminatory acts against African American subordinates.

95.   Unlike Plaintiff, who never engaged in such misconduct, Ms. McGlathery was never placed on administrative leave and removed from the office pending investigation, nor was she removed or threatened with removal from the SES or reassigned to a menial non-supervisory GS-15 position.  Instead, Ms. McGlathery remained a trusted member of Mr. Cuffari's senior staff,

participating in the actions taken against Plaintiff and assisting Mr. Cuffari in ridding the DHS OIG of Ms. Costello, Ms. Ouzts, and Ms. Shaw.

96.     The notorious failure of the Assistant Inspector General for Audits Sondra McCauley to produce substantive OIG audits led to intense criticism by Congress and in the media. To the embarrassment of OIG, Ms. McCauley's failure of leadership was captured in an article in the *Washington Post* that reported that the DHS OIG was "nearly dormant under Trump," as the number of reports and audits plummeted. Washington Post, Mar. 17, 2020. Nonetheless, Ms. McCauley was never placed under investigation, removed, or threatened with removal from the SES, or reassigned to a menial non-supervisory GS-15 position.

97.     Despite her role in Ms. Costello's misconduct, Ms. Kennedy was never placed under investigation, on administrative leave, or removed from the SES and reassigned to a lower-graded meaningless position.

98.     Despite her role in Ms. Costello's misconduct, documented in the WilmerHale Report, Ms. Shaw was never placed on administrative leave or removed from the SES and reassigned to a lower-graded meaningless position.   Instead, after Mr. Cuffari's and Ms. McGlathery's failed attempts to identify SES positions at another DHS component for Ms. Shaw, she secured a position at the U.S. Department of State's OIG, where she currently serves as the Acting IG.

## STATEMENT OF CLAIM

99.     Defendant discriminated against Plaintiff in violation of 42 U.S.C. § 2000e *et seq.* when it harassed him on the basis of his sex and subjected him to a hostile work environment.

100. Plaintiff has suffered emotional distress, pain and suffering, inconvenience, loss of enjoyment of life, humiliation, and other non-pecuniary damages as a result of Defendant's intentional discrimination and harassment.

101. Plaintiff has also suffered monetary loss as a result of Defendant's intentional discrimination and harassment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.   Compensatory damages to fully compensate him for the pain and suffering caused by Defendant's discrimination as alleged in this Complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

B.   Punitive damages for the intentional and malicious discrimination propagated by Defendant, pursuant to and within the statutory limitations of the Civil Rights Act of 1991.

C.   All appropriate monetary relief, including lost wages and bonuses where applicable, in an amount to be determined at trial to make him whole.

D.   Any prejudgment interest on lost wages, bonuses, and benefits determined to be due.

E.   Enjoin Defendant from further discrimination against Plaintiff.

F.   Order Defendant to develop and implement appropriate and effective measures to prevent discrimination and harassment on the basis of protected status, including, but not limited to mandatory training for the DHS OIG executive staff on their obligations under Title VII and other non-discrimination statutes.

G.   Record correction including the purging of all derogatory references to misconduct or poor performance by Plaintiff.

25

H.  Plaintiff's attorney's fees and costs associated with this action.

I.  Award such additional relief as justice may require.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(c).

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support, or if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated:  January 18, 2022

Respectfully submitted,

Dennis M. McGunagle (*pro se*)
425 L Street, NW, Apt. 106
Washington, D.C. 20001-2522
(619) 852-5388
dennis.mcgunagle@gmail.com

26